NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS
AS TO Z.A., Z.A., and Z.A.

No. 1 CA-JV 23-0064
FILED 7-25-2023

Appeal from the Superior Court in Maricopa County
No. JD532027, JS520238
The Honorable Cassie Bray Woo, Judge

**AFFIRMED**

COUNSEL

Robert D. Rosanelli Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant, Father*

Maricopa County Public Advocate's Office, Mesa
By Suzanne Sanchez
*Counsel for Appellant, Mother*

Arizona Attorney General's Office, Tucson
By Jennifer L. Thorson
*Counsel for Appellee Arizona Department of Child Safety*

Center for the Rights of Abused Children, Phoenix
By Timothy D. Keller
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

---

Presiding Judge Michael J. Brown delivered the decision of the Court, in which Judge Andrew M. Jacobs and Judge Angela K. Paton joined.

---

**B R O W N,** Judge:

¶1        Zuilma P. ("Mother") and Santos A. ("Father") appeal the juvenile court's order terminating their parental rights to their children. For the following reasons, we affirm.

**BACKGROUND**

¶2        Mother and Father ("Parents") are the biological parents of Zach (born in 2017) and Zoe (born in 2019). Mother and an alleged father are the parents of Zander (born in 2015).[1] Zander's alleged father is not a party to this appeal.

¶3        In August 2018, the Department of Child Safety ("DCS") received a report that Mother and Father were using drugs. Parents completed hair follicle tests and tested positive for methamphetamine ("meth"). Father also engaged in domestic violence against Mother in the presence of Zach and Zander, including two incidents Mother reported to law enforcement in August and September 2018.

¶4        DCS took Zach and Zander into custody in October 2018. While Zander was initially placed in a licensed foster home, DCS moved him to the home where Zach was living, a specially licensed foster home for children with developmental disabilities. When Zoe was born in June 2019, she was also taken into DCS custody and placed in foster care. DCS petitioned for dependency, alleging the children were dependent due to neglect. On separate occasions during 2019, the court found Zach and Zoe dependent as to Parents, and Zander dependent as to Mother. The court approved a case plan of family reunification.

¶5        During this timeframe, DCS referred Parents for supervised visitation, substance abuse treatment (Terros), and drug testing. Parents were also referred for psychological evaluations to assess parenting ability. Mother attended her evaluation with Dr. Franza in January 2019. He

---

[1]        We use pseudonyms for the children to protect their identities.

diagnosed her with a major depressive disorder, mild intellectual disability, mild meth use disorder (in remission), and specific learning disorders with impairments in reading and written expression. Dr. Franza opined that Mother's ability to demonstrate minimally adequate parenting skills in the foreseeable future was poor at best, in part because of her co-morbid diagnoses and belief that she did not need to learn anything to improve her parenting skills. He also assessed her to be in the "[p]re-contemplation stage" of change regarding drug use, meaning she "appear[ed] to be at a high risk of relapse." He further concluded there were "reasonable grounds to believe that the conditions will continue for a prolonged, indeterminate period of time."

¶6            Dr. Franza evaluated Father in January 2019, diagnosing him with an unspecified personality disorder, moderate meth use disorder (in remission), and a mild intellectual disability. Dr. Franza concluded that Father's ability to demonstrate minimally adequate parenting skills in the foreseeable future was poor. Further, there were "reasonable grounds to believe that the conditions [would] continue for a prolonged, indeterminate period of time[,]" as individuals with similar diagnoses took an indeterminate amount of time to learn and develop new skills and change maladaptive behaviors.

¶7            Dr. Franza recommended that Parents receive: (1) individual therapy provided by a qualified Spanish speaking therapist who has worked with individuals who have intellectual difficulties, (2) specialized substance use treatment, (3) parenting classes and parent aide services in Spanish provided by staff who have experience working with individuals with limited intellectual functioning, (4) community resources to support self-care development, and (5) referrals to community programs.

¶8            DCS continued to provide services to Mother and Father, including parent aide services that included skill sessions, individual counseling, family counseling, assigned parent support partners, and transportation. Given Parents' progress, including completing substance abuse treatment and participating in maintenance recovery, Zander was returned to Mother's custody in February 2020. But in August 2020, Mother had to leave the family home with Zander due to Father's domestic violence. She enrolled at a domestic violence shelter with Zander but was required to leave shortly after because she disclosed the location, and she went to maternal grandmother's house, which DCS had previously assessed as unsafe. The court then ordered Zander to be placed in DCS custody.

¶9          DCS referred Mother for an updated psychological evaluation in January 2021.  Dr. Franza suspected drug use, noting that Mother said she traveled to Mexico where she "tend[ed] to drink and use drugs."  The diagnoses were the same as in the previous evaluation, but also included an unspecified personality disorder, alcohol use disorder, and cannabis use disorder.  Dr. Franza's prognosis remained that Mother's ability to demonstrate minimally adequate parenting skills in the foreseeable future was poor at best, and she had not achieved notable progress with her therapeutic recommendations.  He gave substantially similar recommendations as in the previous evaluation and concluded that although Mother had been provided significant support, she was still having difficulty engaging in treatment and in making progress.  He therefore opined that continued services "may be futile."

¶10         Around the same time, DCS referred Mother for a psychiatric evaluation at Terros and substance testing due to concerns about her social media posts involving alcohol.  Dr. Franza was provided with updated information on Mother's substance abuse and issued a revised evaluation in August 2021.  He stated that one of the factors impacting Mother's ability to parent was that it was "highly likely" she was using drugs and lacked insight into how this impacted her functioning.  Addressing mental health and parenting services, Dr. Franza stated that "individual therapy services may be futile, as [Mother] has not benefited from these services in the past."  And given her continued drug use during her open DCS case and the services provided, he opined that Mother was "unlikely to benefit from continued services, as she has not demonstrated improvement in this area."  Dr. Franza concluded that "[g]iven the nature and extent of [Mother's] condition, continued services are futile at this point."

¶11         In October 2021, Zoe's foster parents petitioned to terminate Parents' rights as to Zoe based on A.R.S. § 8-533(B)(8)(c) (fifteen months' time-in-care), and they later amended the petition to include A.R.S. § 8-533(B)(3) (chronic substance abuse).  Meanwhile, DCS continued to provide Mother with services in 2021 and 2022, including supervised visitation with a case aide, parent aide services (including parenting skill sessions), information on and transportation to the children's medical appointments, a Spanish support group with virtual classes, Family Connections (which helped her connect with resources), and a Terros Spanish-speaking substance abuse counselor.

¶12         DCS lost contact with Father sometime in 2020 and was unaware of his whereabouts until he contacted DCS in December 2020.  Father again stopped contacting DCS or engaging in services for several

months in 2021. When possible, DCS provided Father with services during 2021 and 2022, including supervised visitation, a referral for a psychiatric evaluation, Terros services, drug testing, a case aid with the Nurturing Parenting Program, and Family Connections.

¶13         In February 2022, DCS moved to terminate Mother and Father's parental rights based on fifteen months' time-in-care and chronic substance abuse grounds. DCS then referred Parents for psychological evaluations to assess parenting ability.

¶14         Dr. Menendez evaluated Father in July 2022. She diagnosed Father with substance use disorder, which included underlying personality trait disturbances triggering his substance abuse, and a substantial deficiency in cognitive functioning. She opined that his prognosis to achieve "better results from repeated substance abuse treatment is guarded" due to his "proclivity to relapse" and his tendency to under-utilize the skills he learned in rehabilitation. Her recommendations included continued parenting services that provided "'hands on' instruction and use[d] visual cues and prompts."

¶15         Mother was also evaluated. Her diagnoses included a mild intellectual disability, a depressive mentation, and "most importantly" severe substance use disorder. Dr. Menendez opined that although Mother had been given multiple services designed to enhance her parenting capabilities, she was "unsuccessful at reaching minimal levels of adequate parenting" and continued to be "only marginally compliant with the services assigned to her." Dr. Menendez opined that Mother's ability to safely parent her children in the foreseeable future was "poor[,]" and her "progress seem[ed] stationary and unlikely to change over time." While Dr. Menendez did recommend services for Mother, she said they were "designed to bring closure to [Mother] with regard to her children and redirect her focus to her sobriety and to maintaining her own safe wellbeing." She concluded that Mother was "unlikely to improve her functioning despite continued services."

¶16         The juvenile court held a three-day termination adjudication hearing on foster parents' and DCS's petitions in January and February 2023, receiving testimony from Dr. Franza, Dr. Menendez, Parents' DCS case manager, and Father's Terros clinician. Father was not present at the hearing and the court treated his "failure to appear as a waiver of his rights and an admission of the allegations" in DCS's motion. After providing a detailed analysis of the law and evidence, the court terminated Mother's

and Father's parental rights. Parents timely appealed, and we have jurisdiction under A.R.S. § 8-235(A).

**DISCUSSION**

**¶17** To terminate parental rights, a court must find (1) by clear and convincing evidence that at least one statutory ground in A.R.S. § 8-533(B) has been proven, and (2) by a preponderance of the evidence that termination is in the child's best interests. *See Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286, ¶ 15 (App. 2016). As the trier of fact, the court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004). Accordingly, we will affirm the termination order if it is supported by reasonable evidence. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009).

**¶18** To terminate parental rights under the chronic substance abuse ground, DCS must prove by clear and convincing evidence that Parents were "unable to discharge [their] parental responsibilities" because of their substance abuse and "there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period." A.R.S. § 8-533(B)(3). Also, before acting to terminate parental rights for chronic substance abuse, DCS "has an affirmative duty to make all reasonable efforts to preserve the family relationship." *See Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 186, ¶ 1 (App. 1999). DCS need not provide services that would be futile, nor ensure parents participate in the services offered, but DCS must at least provide "the parent[s] with the time and opportunity to participate in programs designed to help [them] to become an effective parent." *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235, ¶ 14 (App. 2011) (internal quotations omitted). DCS "is not required to provide every conceivable service or to ensure that a parent participate in each service it offers." *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994).

**¶19** The juvenile court found that DCS met its burden of proving both of the alleged grounds for termination, and the court made detailed findings in support of its ruling. Neither parent has challenged those findings except that they separately challenge the court's determination that DCS made reasonable efforts to provide appropriate reunification

services.[2]  In addressing their arguments, we evaluate them only in the context of chronic substance abuse.  *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002) ("If clear and convincing evidence supports any one of the statutory grounds on which the juvenile court ordered severance, we need not address claims pertaining to the other grounds.").

### A.    Father

**¶20**        Father argues the court erred by finding DCS made reasonable efforts to reunify the family because DCS did not provide certain specific services recommended by Dr. Franza and Dr. Menendez.  Father argues he should have been given: (1) individual therapy by a therapist experienced in working with individuals with intellectual challenges, and (2) parenting services with "hands on" instructions that used visual cues and prompts.

**¶21**        In concluding that termination was appropriate, the juvenile court found that DCS made reasonable efforts throughout the dependency to provide Father with appropriate services.  As to substance abuse services, the court found that (1) Father was provided with regular or periodic testing, which allowed him to confront his specific substance abuse issues; (2) Father demonstrated "periods of sobriety and relapses on substances" throughout the dependency, as confirmed by his testing history; and (3) DCS offered him Terros services, also designed to help him address his substance abuse issues.  In detailing Father's participation in Terros the court noted that Father had relapsed several times.

**¶22**        Father does not challenge those findings, which are supported by the record.  DCS began providing substance abuse services to Father in 2018.  He successfully completed treatment at Terros in December 2019.  DCS referred Father for a hair follicle test in 2020, and he tested positive for meth.  He was scheduled for another hair follicle test in April 2021, but he did not attend and stopped contacting DCS during this period.  He then resumed testing between May 2021 and February 2022.  Although his tests were mainly negative, Father tested positive for cocaine in October 2021.  He missed four tests during this period.  In March 2022, Father missed three out of eleven tests.  A hair follicle test revealed "presumptive

---

[2]        Although Parents frame their challenge with the assertion that DCS failed to make "diligent efforts" (as opposed to "reasonable efforts"), for purposes of our analysis under the chronic substance abuse ground no meaningful difference exists between those terms.

positives" to cocaine and meth. Father then missed several tests between May and August 2022, and tested positive for cocaine and meth during this time.

**¶23** Father does not explain how more specialized individual therapy or "hands on" parenting instructions would have made a difference in overcoming his chronic substance abuse, particularly when he was provided with other services designed to address this issue. Thus, Father's reliance on *Mary Ellen C.* is misplaced. *See* 193 Ariz. at 192, ¶ 37 (explaining that the state fails to make "a concerted effort to preserve the parent-child relationship when it neglects to offer the very services that its consulting expert recommends"). Although Father suggests DCS's services were inadequate, his inability to successfully participate in the services that were offered precluded him from achieving sobriety, which was critical in achieving the goals necessary for reunification. The record supports the court's finding that DCS made reasonable efforts to provide Father with reunification services.

### B. Mother

**¶24** Mother argues that DCS failed to make the required diligent efforts because it did not provide the following services recommended by Dr. Franza and Dr. Menendez: (1) individual therapy by a Spanish-speaking therapist experienced in working with individuals with intellectual challenges, (2) a parenting-skills instructor with similar qualifications, and (3) domestic-violence counseling.

**¶25** The juvenile court found that DCS made reasonable efforts throughout the dependency to provide Mother with appropriate services. Relating to substance abuse, the court found that Mother was referred to substance abuse testing and Terros, which were both designed to help her overcome her substance abuse issues. The court found that Mother's substance abuse testing also showed periods of sobriety and relapses; the court then detailed Mother's history of missed testing and positive test results supporting its finding. The court explained that even though Mother initially completed substance abuse treatment, she then relapsed. Between 2021 and 2022, she unsuccessfully closed out of Terros four times. Further, the court found that when DCS referred Mother to a new provider in 2022, she admitted to using meth on and off for eight years.

**¶26** Mother does not challenge any of those findings. Even so, they are supported by the record. DCS provided substance abuse services to Mother beginning in 2018, and then again in December 2020 in response

to Mother's social media posts. Mother received a psychiatric evaluation from Terros in December 2020. She missed several tests between January and December 2021, and tested positive for marijuana, alcohol, amphetamine, meth, and cocaine during this period. She was suspended from PSI (drug testing services) in January 2022 for lack of engagement. She was required to test in February and March 2022, but again tested positive for amphetamine, meth, and cocaine. Between April through September 2022, Mother missed several tests; however, the tests she took were negative. *See Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 379, ¶ 29 (App. 2010) (finding that "temporary abstinence from drugs and alcohol does not outweigh . . . significant history of abuse or . . . consistent inability to abstain"). DCS also referred Mother to Terros in 2021, and she was assigned a Spanish-speaking substance abuse clinician.

¶27 Mother does not address how the specific services DCS failed to provide would have helped her address her substance abuse issues. Her inability to show she could remain drug free for a sustained period justifies the court's finding that termination was proper based on her chronic substance abuse. Mother was unable to properly engage in the substance abuse services to help her achieve the goal of reunification. And insofar as Mother relies on *Jordan C.*, 223 Ariz. at 96, ¶ 29, to support her argument that DCS must provide the services recommended by its consulting experts, that case does not support her position. There, the therapist recommended the State provide mother with a therapist to assess her relationship with each of her children. *Id.* But the State limited the mother's mental-health services to mother's older children only. *Id.* As noted, DCS provided substantial services intended to assist Mother in overcoming her substance abuse problems.

¶28 Mother also argues DCS failed to accommodate her hearing disability. However, DCS made various attempts to help Mother, including (1) exploring resources to help Mother obtain hearing aids, (2) providing the $150 application fee for Mother's hearing aids, and (3) helping her schedule an audiogram to receive hearing aids, as lack of an updated audiogram in the last ten years caused delay in submitting her application. In any event, Mother does not explain how her hearing disability affected her capacity to avoid abusing substances or participate in the substance abuse services DCS provided. We conclude that the evidence outlined above supports the juvenile court's finding that DCS made reasonable efforts to provide reunification services to Mother.

**CONCLUSION**

¶29      We affirm the juvenile court's termination order.

